Thank you, your honors. Good morning. May it please the court, my name is Leonard Feldman and I'm counsel for United. I'd like to reserve five minutes for rebuttal, but I'll keep track of my own time. What is your name? Leonard Feldman, your honor. Oh, okay. That's what I have. Thank you. Thank you. The jury in this matter found that STC intentionally and unjustifiably interfered with United's contracts with two of its biggest customers in San Diego. That happened only after the district court on three separate occasions had found that there was sufficient evidence to go to a jury. But a year later, the district court reversed those prior rulings, weighed the evidence, found factual disputes in favor of STC, and nullified the jury's verdict. But let's assume, and I want to focus on the intentional interference claim, let's assume that the district judge erred in granting the JMOL on the stranger theory. What concerns me in this case is sort of an anomaly in the record. The district judge said, well, I've looked at the instructions and I should have done something different and I should have granted a new trial, but I'm not going to grant a new trial because I'm granting a JMOL. Normally, we expect a judge in that circumstance to grant a conditional new trial and a JMOL, but the judge's denial of a new trial with respect to the instruction issue is really not a denial in my view. He's basically saying, I should have granted, you know, I messed up, I should have granted a new trial on this, but luckily I don't have to because I'm going to grant a JMOL. Now, how do we review the judge's denial of the new trial here? Normally, let me just finish this so you understand my mindset on it. If the judge had granted a new trial conditionally and also granted the JMOL, I think we would defer to his notion that the instructions were misleading and we ought to have a new trial. He denied it, but not really. So what do we do with that? Well, I think that the issues are fairly discreet and the Court can address them in turn. You're looking specifically at the denial of a motion for a new trial. I would say that he correctly denied the motion for a new trial. But his only reason for denying it. His only reason. Okay. So tell me why. Right. So that turns on whether there was or was not instructional error. If there was instructional error, then if this Court finds that there was a duty not to interfere on the interference with contract claims, then that basis for denying the motion for a new trial disappears, and we move into what's the correct remedy. And that's how we view this, is that the Court should first look at whether there's a duty not to interfere and then decide on the remedy, which is either to remand for a new trial or remand for reinstatement of the jury verdict. Okay. And that's what I'm having difficulty with on the intentional interference side. My difficulty with sending it back to reinstitute the jury verdict is that the district judge, who, as you said, sat through this long, long trial and thought about it a long time, after reviewing the record, said, I should have given the jury more instruction about the contracts between your client and the decorators. Right. And I didn't. And they were confused, and I saw it in their questions. And now that I think about it, I really should have given them more detailed instructions. And whether or not the instructions he gave them were correct no longer becomes an issue in my mind. Your Honor, I think it's no different than any other instructional error case. The instructions are reviewed by the Court to determine whether there was anything erroneous about them. And if you look at what this district court judge said during the jury instruction conference, he was dead right at that point in time.  And he was right about that, because there are two species, I guess, of an intentional interference claim under California law. There's one where the defendant prevents performance, and there's another where the defendant makes performance more expensive. This is the latter. United continued to administer trade show cleaning services at the CNTC,  both before and after the exclusivity policy. Only one thing, and one thing only, had changed, and that was that it became significantly more expensive to do it after the exclusivity policy. So as the district court correctly recognized at the jury instruction conference, the contract was immaterial. And maybe I read the contracts wrong, but as I read your contracts with GES and Champion, they do have some assumption in them that San Diego Convention Center might require use of its own people to do things. Is that a fair reading of them? No, I don't think that's a fair reading, and I'll say why. It's because what the contracts with GES and Champion require is that GES and Champion use their best efforts to retain United. These are contracts that are nationwide. United and GES and Champion, they're negotiating. There's too many acronyms here. Yes, there is. It's a complicated case. They're negotiating this nationally. They're not negotiating it with SDC in mind. They're negotiating it with all different venues in mind, and the only performance that they expected from any party whatsoever was not as to the convention center owners but as to the decorators or the general contractors, that those decorators or general contractors would allow GES and Champion to select their own cleaning company. And so this isn't a situation where SDC is at the top of a contractual chain. Well, I'm looking at, and the agreements I think are roughly the same, but I'm looking at, and this is the GES agreement that says United agrees to perform and supervise such cleaning at the price applicable established by GES, and then it says as long as GES's right to retain United is not restricted by law or show management's relationship with another cleaning service provider. I'm not sure I know what that means. I'm not sure the jury knows what that means, but doesn't that at least raise some question whether or not the contract at the outset assumed that the management of the show might require something else? Yeah, and you're right to say management of the show. That's the trade show, the trade show manager, or the general contractor. That's not the convention center. The jury did not in this case need to know anything about any of those contractual rights because the general contractor, GES and Champion, were in fact able to hire United. There was no condition, precedent, or contractual term that prevented them from hiring United, and they did hire United. All that matters is it was more expensive. Didn't a convention center adopt a policy? It did. And didn't they have the right to adopt a policy? They did not, and I'll explain why. Okay, explain. Imagine if instead of saying that only our trade show cleaning service can provide trade show cleaning in our convention center, STC had a contract that said only men can provide trade show cleaning services in our convention center. That's independent wrongfulness. Let's assume for a second that there's no independent wrongfulness in it. The only wrongfulness is interference with your contract. So put aside the antitrust issue for a second. Why can't they say when they redo their license agreements with the exhibitors, well, we're redoing our license agreements, and at this point in time we've changed our policy. From now on we want this. What's wrong with that? Because the law prevents them from doing it, and whether it's gender discrimination laws, racial discrimination laws, antitrust laws. No, I ask you to assume no antitrust problem. So we're just talking about interference with contracts. Right. So I've got a contract with Judge Ferris, and I agree that he agrees to supply me with legal research. And the contract runs its course, and in the meantime he contracts with Judge Bright to get the research to him. And the contract runs its course, and I change the contract with him. And I say from now on I only want you to use LexisNexis. Right. Have I interfered with his contract with Judge Bright? There's about a seven-part test, Your Honor. I know. I can't understand the seven-part test. So what's the bottom line? We have to walk through that. The answer is that if you are not a party to Judge Ferris's contract with Judge Bright. And that's true here, too. Right. So you are a stranger to that contract. And under California law, which limits your freedom to contract, you do not have the right to interfere. You have an obligation not to interfere. We then look at the problem. So Judge Ferris can restrict my freedom to contract with him by telling me he's entered into a long-term contract with Judge Bright? He's not restricting it at all. California law does that. And the question is, did you know about the contract with Judge Bright? Did you intentionally interfere with that contract with Judge Bright? Did you have a justification for interfering with that contract with Judge Bright? And maybe you did. Are those the questions? Everything you've said in the questions, isn't that what the district court said? That's why I made a mistake? And now why the instructions? No, not at all. Because all that the jury needed to know from the jury instructions was that the contract existed and that SDC interfered with it. But I do want to make one point. By the way, I take your point that that appears to be California law. I have no idea how California arrived at that law in light of the restatement. But you guys live here, so let's assume that's the case. And if I could make one other point, Your Honor, it's not as though you told Judge Ferris that he couldn't contract with Judge Bright. It's as though I told Judge Ferris that he could no longer contract with Judge Bright. This is not a three-party contract. This is about a five-party contract. And SDC is not part of the contractual chain that includes the trade show, the trade show manager, the general contractor, and the cleaning service. And that is another reason why it is clearly a stranger to that contract, and it had a duty not to interfere. We've used a lot of your time up on the intentional interference side of the case, and I know you want to address the antitrust court. I do. And the antitrust issues, again, it's another situation where the law has become more clear that the district court erred. On the interference, of course, there's the cases that we cite in our Rule 28J letter that strongly support our argument. On the antitrust issues, we have two very significant decisions, the most important of which, of course, is the U.S. Supreme Court's decision in Phoebe Putney. And we also have the Fourth Circuit's recent decision in North Carolina State Board of Dental Examiners. And when we look at Phoebe Putney in particular, we see a very, I would say, strong articulation of the clear articulation test. It is not enough that the State of California authorizes SDC to play in the market. To satisfy the clear articulation test as authoritatively set forth in Phoebe Putney, there has to be a clear articulation of authority to act anticompetitively. And the district court here identified nothing more than general corporate powers. That's the exact argument that the U.S. Supreme Court rejected in Phoebe Putney. SDC has retreated somewhat. They've moved from the clear articulation test to a subset of that, which is the foreseeability analysis. The United States Supreme Court rejected that argument in Phoebe Putney as well. And the U.S. Supreme Court cited Halley and Omni in support of that. And they're both cases where the substate entity could not have exercised its delegated authority without acting anticompetitively. And we don't have that here. So on the antitrust claims, the U.S. Supreme Court's decision in Phoebe Putney, it's not enough that the State of California authorizes SDC to play in the market. The immunity analysis of the district court is refuted by Phoebe Putney, which, of course, is a decision that was not available when the district court ruled. If the court goes from clear articulation test to the active supervision test, that's an issue that the U.S. Supreme Court did not address in Phoebe Putney because it ruled in favor of the plaintiff on the clear articulation test. But both legally and factually, the analysis is very similar or very simple. Legally, we have this Court's opinion in Washington State electrical contractors, and we have the Fourth Circuit's very recent decision in North Carolina State Board of Dental Examiners. Both of those cases make very clear that SDC has to satisfy the active supervision requirement. And there's no evidence at all of any supervision, whether you look at it through the state action immunity doctrine when we're looking at the state. The state didn't supervise anything that SDC did, and the state didn't authorize anything that SDC did. Or if you look at it through the Local Government Antitrust Act, there was no supervision by the state or by the City of San Diego, and there was no authorization by the City of San Diego to engage in anti-competitive conduct. And as Phoebe Putney makes clear, authorizing someone to play in the market doesn't mean that they can roughhouse in the market. What's the antitrust, underlying antitrust violation here? There are two of them, Your Honor. One is actual monopolization, and the other is attempted monopolization. Does the market that you're defining is the market for supplying labor at the San Diego Convention Center? That's correct. See, it's a strange antitrust claim. I own a building, and I say at some point, I would like my own employees to clean up the building. I understand your intentional interference claim. And you're saying, well, you've monopolized the market on that building. There are plenty of convention centers around. The record's pretty clear that they compete with each other for these trade shows. If you define the relevant market so narrowly that it sort of eviscerates the purpose of the Antitrust Act. Well, I wouldn't say it eviscerates the purpose of the Antitrust Act. I would say it promotes the purpose of the Antitrust Act. In this particular situation, there's very detailed testimony by Dr. Heckman in the record below, and he applied the significant non-transitory. No, I read it and understood it as well as you did. Yeah, and it's in the DOJ merger guidelines, and when he applied that, he testified that the market here is trade show cleaning services at large convention centers in San Diego. Of which there's only one. Of which there's only one. And your question, frankly, reminds me of what this Court addressed in the Sciufi case, another antitrust case where the authors of that decision and the judges that joined it, they went through the testimony of the expert on market definition and said, there are some flaws in this testimony. They described them as shortcomings. And that may very well be your opinion, just as it was the Court's view in Sciufi. And what the Court said in Sciufi is the jury gets to decide those issues. And there's no shortage of cases that say this is a fact issue. And when the district court judge addressed this issue, and remember, three times he addressed this issue, he found that there was a wealth of evidence on all of the different prongs of the antitrust claims, and it had to go to a jury. And so on the antitrust side, you're seeking a new trial. That's correct. And so what we're asking this Court to do is reinstate the interference with contract verdict and then remand the remaining claims for additional proceedings. And why don't you say the rest of your time, then? Thank you very much, Your Honor. Thank you. Good morning. May it please the Court, my name is Joe Ergastolo. I represent the respondent, San Diego Convention Center Corporation, Inc. This dispute, in a nutshell, is about control. Who should be in charge of decision-making at the San Diego Convention Center? Should that decision be made by a subcontractor regarding cleaning, or should that decision be made by the manager of the building, my client? For purposes of this appeal, you're not contesting that the intentional interference claim should have gone to the jury, are you? I don't read anything in your briefs that says, We should have gotten a JMOL on the intentional interference claim. Or do I misread them? I think there wasn't a sufficient ---- I'm not asking what you think. I'm asking whether or not you asked this Court on the intentional interference claim to grant you a verdict in your favor. I don't find that in your briefs. Actually, I think we are asking for a verdict in our favor on the intentional interference. I thought you were just seeking to uphold the ---- Well, I'm sorry. You're seeking to uphold the judge's JMOL. Absolutely. Right. Okay. On the stranger theory. On the stranger theory. Now, assume that ---- Right. I shortcut my question. Assume the stranger theory doesn't work for a moment. You can address to us why it works. Was there sufficient evidence to go to the jury in this case? If the stranger theory doesn't work ---- Then that's what ---- You don't argue to the contrary in your briefs. I apologize. We don't argue to the contrary in the briefs because the heart of the interference claim in this case is the stranger theory. That's ---- I didn't hear that. The heart of the interference claim is the stranger theory. Okay. So no one has focused on any other elements here. So your position, and this is a wrong way of getting to it, is your position is on the JM, on the intentional interference claim that you win because you were not a stranger to these contracts. That's correct, Your Honor. Tell me what cases support that position. Marin has broad language, but it really doesn't deal with this situation. I mean, where in tort law is this notion that because you know the parties, or they're dealing with something that's relevant to you, you're not a stranger? Your Honor, the issue isn't simple knowledge of the parties. It's a couple of things, and the case, the California Supreme Court case on this issue is applied, of course. And, of course, we've got the Ninth Circuit case of Marin Tug. Now, the issue is, in applied, third parties that were not strangers had no duty not to interfere. And the court defines stranger there as interlopers who have no legitimate interest in the scope or course of performance. That's what we're looking at. But do you have any legitimate interest in the scope and course or performance of the contracts between UMC and its exhibitors? Absolutely. Your interest is only in the performance of the licensee's obligations to you, isn't it? Our interest is in the performance of the licensee's obligation to us. The licensee's obligation to us includes what we call the house rules, the policy rules and regulations, the PRRs. I wanted to ask you about the policy rules and regulations. Very important. But when you opened here, you said, who should run this operation, the third parties or the manager? And I wanted to ask you, I know there was a you refer your brief to a policy, but wasn't that just the manager's ruling and the board did not make a policy or did the board make the policy? The decision to change the policy in July 2007 was made by the CEO of the San Diego Convention Center Corp, Carol Wallace. So can she make can I can policy made changes be made just by the manager under the bylaws and the rest of it? The board never questioned the change on us. I know they never questioned it. But did they ever affirmatively act themselves and say, we are changing the policy? They did not. OK, that's good. So the regular parts of the contract that I was reading before and there's other parts of the contract to talk about the rules and regulations of the convention center. Are those applicable? Is this just is this just a policy as opposed to a rule? In other words, there are PRRs that are in writing. They are in writing. And so they knew they were taking entering contracts subject to those PRRs. Correct. Did they know they were entering them subject to the manager's change of policy? Yes. The PRRs specifically provide or the license agreements specifically provide that you are subject to the PRRs. Your licensees are subject to PRRs. And the convention center corporation reserves the right to change the rules between the time that the contract is entered into and the time of the event. There's a reason for that. These events, the larger the event, the further out they're scheduled. So for a large event like the National American Bar Association convention, it could be ten years from the time that it's first identified as a potential event at the convention center to the time that it actually happens. A lot happens in those ten years. Laws change. Processes change. So the convention center reserves to itself the ability to change the rules, the backhouse rules. And that's exactly what it did in this case. It changed the rules for a very specific reason. Did it change them with respect to an existing contract with licensees? Yes. And also with respect to new contracts? Yes. Yes, because it reserved the right to change those rules. It shifted the burden of those changes from the convention center corporation to the licensees. It wanted to be able to maintain control over its own operations, and it's too hard as a policy decision to predict what's going to happen in the law or in your operations going out so far. So let me ask the question I started to ask at the beginning and asked badly, and it's the same question I asked your opponent, and I don't pretend to be an expert about California law, although we will pretend to be experts if we have to decide this issue. Aside from the stranger issue, does one state a claim for intentional interference under California law under these circumstances? In other words, is there a jury question? Aside from the stranger issue. See, I'm the example I gave of the three judges getting together to do research struck me as in most cases we would say your interference with a contract had to be wrongful. And that's what the restatement seems to say. But as I read the California cases, they don't say that. They don't require wrongfulness. They just say if you've intentionally interfered, it goes to the jury. Is that a fair reading of the California cases? I don't think so, Your Honor. The case I want you to consider is the PM group case. That is the PM group case, the Rod Stewart case. That is a California court of appeal decision that's very similar in terms of a contract structure. In that case, Rod Stewart contemplated doing a tour in South America. He is a contemplated. In contemplation of that tour happening, a promoter entered into contracts with sub-promoters, okay? And a lot of money was exchanged. It turned out Rod Stewart didn't do the tour. He changed his mind. He then got sued by the promoter for interfering with the contracts with the sub-promoter. Court, PM group court, California court of appeals said, no, there's no interference claim there. But wasn't that a wrongful interference with perspective advantage claim? No, it was a wrongful interference with contract. It was actually a contract entered into between the promoters and the sub-promoters. So we have a California court of appeal decision that has very similar fact structure to what we have here. Now, the whole thing in that case was the sub-contracts contemplated the performance by Rod Stewart. And when that performance didn't happen, there's no claim because you have no contract. The analogy I like to make to this is a little bit different than the one you presented regarding research, Your Honor. And I made it up on the spot, so I'm not proud of it. Well, I enter into a contract with my colleague, Andrew Skouten, to have Mr. Skouten clean this courtroom. I don't tell the GSA about the contract, or even if the GSA knows about the contract. Certainly, this contract is not valid at all because it's the GSA that has the right to the courtroom. So I can do whatever I want, but it doesn't mean that I'm interfering with, you know, GSA. I won't be able to sue GSA when GSA says, no, Mr. Skouten, you don't have the right to clean that courtroom. That's the P.M. Brew case. Those are the same facts that we have here. So I think that case, even though it's a court of appeal decision from the State of California, it applies the applied case. It follows applied on pushing strangers past just the parties. So I think we've got a case on point here. Don't the more recent California opinions sort of limit strangers to people with a direct financial interest in their performance? There are other decisions that so limit. There are other decisions going the other way. I agree with the Court. This is a complex issue. I counted approximately 18 cases, about 10 fall on one side and 8 fall on the other. This one gets very close to the core of what applied was trying to protect against and what P.M. Group held, which is when you have a relationship, subcontract relationship that cannot exist, that cannot exist without the prime relationship. If the convention center doesn't market a show and doesn't get a show in the door, United's got nothing to clean. Here's what bothers me. I would agree 100 percent. You know, the law said, you know, stranger has a right to interfere. But didn't the court even the court granted a new trial or J. And I'll be on the basis of not that theory. The court, as I understand it, didn't adopt the stranger theory, but adopted what seemed to be a theory in California that unless you're a party to the contract, you're not a stranger. I'm not sure that that's accurate, Your Honor. My recollection is that the district court the district court's decision on the jury instruction is effectively moot here because of the district court's decision granting judgment as a matter of law on the interference claim. It's a backup. It was the if this case was backed in because I'm wrong on the J. On the interference claim as a matter of law, then it needs to be tried again because of the jury instruction problem. What the judge said was I messed up the jury instruction, but it doesn't matter. It doesn't matter because I find as a matter of law that it doesn't matter. Can we go back to the intentional interference claim for a second? I asked your opponent at the beginning how we review the judge's what I view as alternative decision to grant a new trial, even though he denied the new trial. How do we review that? Do we review that de novo? Do we review that with some deference? What's our standard of review? I think the standard here on a jury instruction is with some deference. I think the judge had the benefit of seeing the problems that this jury instruction created, and I think the judge, after he saw all of the evidence, realized that he made a mistake. See, it's a strange situation. A district judge said something like this. I think my instructions were correct, but I should have said more. I mean, at least that's with respect to the, with respect to his, about what the contracts provided, so they could have understood whether or not there was a, they'd induced a breach or intentional interference. How do we review that decision? It's not, it's one thing for the judge to say my instruction was wrong. We can take a look and say, yes, it was, or no, it wasn't. How do we review a decision when the judge says, I think my instructions were okay, but I should have said something else. There was more I should have said. I think when Judge Battaglia says, I think my instructions were okay, but I should have said more, I think Judge Battaglia is basically saying, I think my instruction is wrong. And I think that's the way you have, this Court has to address it, is to assume that there is an error in that instruction that he corrected. So then do we review that de novo? Do we give him some deference? We can tell about error, as your opponent said correctly, we can tell about errors of law as well as the trial judge. What we have more difficulty telling is things that he sees in the courtroom. So is this something we refer with deference, or is it something we review with no deference? I think we review this with deference, given the, well. In other words, if the judge had said, gee, you know, this is against the weight of the evidence. I'm the 13th juror, and I'm going to take another shot at it, we would say he was there. But here the judge is saying, I don't think I instructed the jury correctly. Do we defer to that? I think we defer to that. And I think we defer to that because he was in the best position to, he heard the concerns of this jury, the jury that we had, about this exact question. We were called back to court a couple of times because the jury didn't understand the contract structure. The instruction that we preferred would have resolved those jury questions. At the time that we actually requested that the court give further instruction, it was denied. I think there's a bigger picture here that starts with the denial of the request of jury instruction, case going to jury, jurors asking questions regarding this exact issue, the court denying again after our request that the instruction be given. And then after the verdict comes in, the court said, gee, I think you're right, best DC. This wasn't as clear as it could have been on the contract structure. Can you, again, we've used a lot of your time on contract. Can you address the antitrust part of this case? Sure. Of course. And I'd like to start with the state action doctrine and be very brief. We do have a U.S. Supreme Court case, the Phoebe Putney case. It does lay out a test. The test isn't any different than the test that existed before. The first part of that test is that the state authorized the Convention Center Corporation's actions that's challenged by UNM. And what we're looking at here is the grant. Is the grant general? Is the grant neutral? Or is the grant specific enough to permit the alleged anti-competitive conduct? And there's three code sections from the California Government Code that lay out this grant. One of them, admittedly, is general, 37501 of the Government Code. That one is very similar to the grant that was in the Phoebe Putney case, which permits a city to construct or maintain a convention center. The second one, 37505 of the Government Code, is much more specific. It says that the money that's to be made by a convention center is to be used, one, to pay expenses, two, to pay off bonds, if any, and three, go back to the city treasury. Our position is that that second grant, where there's a specific discussion of money having to be made to pay off the bond and pay the expenses, is more than sufficient to contemplate anti-competitive conduct, alleged anti-competitive conduct. So under 37505, we don't think, we think that section takes us out of the holding in Phoebe Putney and the general grant that was discussed in Phoebe Putney, because it authorizes the city to use the convention center to raise money to pay for itself and then to pay, go back to the city any extra money. Now, competition for cleaning the convention center would siphon off funds that would otherwise go to the convention center. So it's going to have a direct impact on that section that deals with the state saying money goes to pay expenses and money goes to pay bonds and then it goes back to the city. So I think this case, while Phoebe Putney is the law, factually, Phoebe Putney had a very general, neutral grant. We don't have that general, neutral grant. We have a much more specific grant, and therefore, we have state action immunity. The second issue that I'd like to address in my two minutes remaining is the Sherman Act claim, and the Sherman Act section 2 claim, the monopolization claim. And the only real issue I want to discuss there is the element of monopolization under the essential facilities monopolization claim. In order to obtain reversal, UNM has to demonstrate that it presented legally sufficient evidence at trial that SDC possessed monopoly power in the relevant market and other things, but I want to talk about that one only, given the amount of time I have. To prove monopoly power, UNM, United, relied solely on the essential facilities doctrine. That doctrine requires that two markets be defined and that United prove the upstream-downstream market, monopoly control of the upstream market, necessary, because only then does the control over a facility give with it the power to eliminate competition. What we have here is very odd antitrust markets, and the definitions that were preferred by United are almost economically irrational, that the San Diego Convention Center itself could be a market. When you look at reality of where the markets are, the upstream market here, and United agrees with this, is the national market for hosting trade shows. No one contends that San Diego Convention Center has monopoly power in that national market for hosting trade shows. It's undisputed that San Diego Convention Center's share of that market is less than 10%. So one way that you can show the monopoly power is by showing that percentage. That's the circumstantial evidence test. That's the rubble oil case. Another way is direct evidence. There's only two ways to do this, circumstantial and direct. Direct evidence requires a showing of super competitive pricing and restricted output. That's the Forsythe case. There is no evidence in the record of super competitive pricing, and there wasn't even an effort below to address the restricted output component. So the theory that United chose to prosecute this case, this essential facilities, may I wrap up, Your Honor? Sure, sure. The theory that United chose, it simply doesn't fit the facts of this case. We don't have two defined markets that make any sense under the essential facilities doctrine. And that's why these briefs struggle with this issue, because when you step back from it and look at it from about 30,000 feet, this isn't an essential facilities case that's prosecuted. So the bottom line, in your view, the valid decision should be what? Absolutely affirm the district court's judgment across the board. Thank you. Thank you. Let me ask you a question about the antitrust claim, and I want to separate it. Let's assume that you were not dealing in this market yet. UNM was looking at coming to San Diego, and the convention center had a rule that said cleaning at the convention center must be done by our own employees. I take it you would say that's a violation of the Antitrust Act? That's correct. And why? Because the convention center is an essential facility, and the market, as defined by Dr. Heckman, consists of trade show cleaning services at large convention centers in San Diego. And I understand that's your position. So I want to get to your essential facility argument. Why is this an essential facility? If I'm Comic-Con, I mean, San Diego is really nice, but they put on the show all over the country, and they could put it on in Orange County or L.A. or Seattle or some other hip place. Why is it an essential facility for the licensees? The way that the antitrust merger guidelines address that issue is to determine whether San Diego Convention Center can increase the price for trade show cleaning services a significant non-transitory amount, and Comic-Con will go to another city. And Dr. Heckman addressed that issue in his testimony, and he said that Comic-Con and other trade show organizations are not going to go to other cities. And so when you're looking at the ability of trade show cleaning companies to compete in San Diego, they can't compete because San Diego Convention Center has tied up in the city. And that leads to my next question, which is that it seems to me that that doctrine is designed to protect the licensees. In other words, because it's an essential facility, they're going to have to buck up and pay the extra costs. Does that antitrust doctrine protect sub-licensees, subcontractors, in effect, like your clients? Your Honor, there may be standing issues in any particular suit like this, but not here because the exclusivity policy relates directly to trade show cleaning services. So the parties with direct standing to challenge that would be the parties that provide trade show cleaning services. And I take your point. If the essential facilities doctrine is there to say to somebody like Comic-Con, I've got to use this facility. It's not saying that to Comic-Con. It's saying that to the downstream users of the essential facility. And the example that Dr. Heckman used at trial is a railroad that controls a bridge across a river. In order for there to be competition among the various railroads, they all need to be able to cross this river. And the antitrust laws make a judgment, a pro-competitive judgment, that in that situation, in order to ensure that there's competition, there has to be access. And in this particular case, we have the combination of the controller of the essential facility on the one hand and market power at the market for trade show cleaning services on the other hand. And it's that combination that allows United to bring a claim for antitrust violations. I gave your opponent an extra minute, so why don't you sum up? If I could, the issue in this case, Your Honor, is a very significant one. And the reason why there's a meekie present in this case is it's a recognition of what we're dealing with here. This isn't just about trade show cleaning services. It's about all subs that operate within convention centers. And if the district court's analysis is correct, then there is no limit to what convention centers can do, both in California and elsewhere, to displace that competition. And, Your Honors, that's not the law in California. That's not the law on interference with contract. It's not the law of antitrust. And we ask this Court to reinstate the jury verdict and remand the remaining claims to trial. Thank you, counsel. The case is submitted. And I, on behalf of my panel, I want to thank both sides for their excellent briefs and arguments. Thank you, Your Honor.
judges: Bright, Farris, Hurwitz